JOHN D. SCHROTT AND ESTATE OF WINONA W. SCHROTT, DECEASED, JOHN D. SCHROTT, EXECUTOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schrott v. Commissioner
Docket No. 42603-86
United States Tax Court
T.C. Memo 1989-346; 1989 Tax Ct. Memo LEXIS 345; 57 T.C.M. (CCH) 981; T.C.M. (RIA) 89346; July 19, 1989
*345 V abandoned a home security system which it paid to have installed in Ps' residence. Ps conceded that the abandonment of such system constituted a distribution of property with respect to V's stock taxable in the manner prescribed by section 301. Held: The amount of the distribution received by Ps equaled $ 8,250, the fair market value of the home security system on the date of distribution. UVB discharged a portion of Ps' indebtedness at a time when Ps were not insolvent. Held: Ps realized income from the discharge of indebtedness. Held further: Ps are not entitled to exclude or offset such income under the common law in effect prior to the enactment of section 108(e)(2). UVB also cancelled the indebtedness of K, a limited partnership in which Ps were limited partners. Held: Ps must recognize their distributive share of the income which K realized from the discharge of indebtedness. Held further: Ps are not entitled to an offsetting loss in an amount equal to their distributive share of such income. V paid certain legal expenses incurred in cases involving both V and Ps as defendants. Ps subsequently reimbursed V for such expenses but the amount of that reimbursement was loaned *346 back to Ps. Held: Ps' reimbursement of V constituted a sham transaction because no purpose existed for the loan back other than the immediate return of Ps' funds from V. Held further: The mitigation provisions, sections 1311 through 1314, are not applicable. Held further: Even if they had actually reimbursed V, Ps still would not be entitled to a deduction because such expenses resulted from V's, not Ps', business. Lohrke v. Commissioner, 48 T.C. 679 (1967), followed. Glenn J. Sedam, Jr., Edward S. Culbertson, and Joseph P. Spellman, for the petitioners. Diane D. Helfgott and Richard M. Marsh, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the years and in the amounts that follow: Year
Deficiency
1973
$  12,100
1975
73,790
1976
100,755
After concessions, the issues for decision are: (1) Whether and to what extent, if any, petitioners, as shareholders of a corporation which paid to have a security system installed at their residence, must recognize gain upon abandonment of that system by the corporation; (2) whether petitioners realized income from the discharge of indebtedness *347 incurred by them personally and, if so, whether petitioners are entitled to exclude such income or offset it with a deduction of the same amount; (3) whether petitioners realized income from the discharge of indebtedness incurred by a limited partnership [1] in which they were limited partners and, if so, whether petitioners are entitled to offset such income with a loss of the same amount; and (4) whether petitioners are entitled to deduct the amount paid to reimburse a corporation, in which they were shareholders, directors, and officers, for certain legal expenses incurred in cases involving both the corporation and the petitioners as defendants. For clarity and ease of discussion, our findings of fact and opinion for each of the four issues are *348 presented separately except that certain background facts pertaining to each of the last three issues are set forth at the beginning of our discussion of those issues. Some of the facts have been stipulated and are found accordingly. The stipulations and exhibits attached thereto are incorporated herein by reference. At the time the petition in this case was filed petitioners, John D. Schrott and Winona W. Schrott, resided in McLean, Virginia. Winona W. Schrott subsequently died and her husband, John D. Schrott, was named executor of her estate. He represents his own interest and the interest of his deceased wife's estate in this matter. [2]
Issue 1 - Home Security System FINDINGS OF FACT In 1973, Vortex Corporation (Vortex) contracted with ADT Corporation (ADT) for the installation of security systems at the personal residences of petitioners and petitioners' son, John D. Schrott, Jr. (Schrott). The total contract price for both systems was $ 64,301. [3] The contract price of *349 the system which ADT installed at petitioners' residence was $ 18,443.04. Vortex arranged for the installation of that security system primarily to protect duplicate copies of its records which were stored in petitioners' house. The security system installed at petitioners' residence consisted of an interior system to protect the house and an exterior system which covered the outlying area, including the area around the swimming pool. ADT also installed smoke detectors on every floor of petitioners' house. After completing the installation, ADT returned to petitioners' residence on numerous occasions to adjust and repair malfunctions in the security system. The system frequently would not arm itself and even when it was armed the system was prone to false alarms. The security system was sometimes kept turned off for several days at a time because of the recurrence of false alarms. ADT's repair people repeatedly restored the system to operation but it would only operate *350 properly for a short time before malfunctioning again. Petitioner John D. Schrott learned how to perform some repairs on the system himself, and purchased the parts necessary to do so, but his repairs were not sufficient to keep the system operating other than on a temporary basis. Similar problems plagued the more complex and costly security system Vortex had ADT install at Schrott's residence. That system included television monitoring equipment which was supposed to be capable of functioning in extreme nighttime or darkened conditions. The ineffectiveness of the television monitoring equipment for nighttime use prompted Vortex to file suit against ADT seeking rescission of the contract, removal of the security system from Schrott's home, restoration of the premises to their original condition, and reimbursement for over $ 160,000 of other expenditures Vortex incurred at Schrott's residence in conjunction with the installation of the security system by ADT. The complaint filed by Vortex in August 1974 in the United States District Court for the District of Columbia contained no allegations regarding the shortcomings of the system installed at petitioners' residence. Vortex settled *351 the suit with ADT in October 1974 by paying ADT $ 10,700. That amount represented payment in full by Vortex to ADT with respect to the installation of security systems at the residences of both Schrott and petitioners, notwithstanding the previously agreed upon total contract price of $ 64,310. The settlement agreement released the executing parties, ADT, Vortex, Schrott, and petitioner John D. Schrott, from any and all claims they had against each other. Vortex abandoned both home security systems and deducted $ 47,571, [4] on its Federal income tax return for the taxable year ended September 30, 1974. After Vortex settled its suit and abandoned the security systems, petitioners retained an ADT employee who attempted without success to fix the system at their residence. In 1978 *352 or 1979, petitioners turned to another company to remedy the deficiencies in their home security system. That company removed all of the main controls previously installed by ADT and rewired the security system to accommodate its own controls. Thereafter the security system operated to the satisfaction of petitioner John D. Schrott. Petitioners claimed a substantial loss on their 1974 Federal income tax return. In his notice of deficiency, respondent determined that the carryback of that loss claimed by petitioners on their 1973 Federal income tax return exceeded the amount allowable after certain adjustments and modifications. The particular adjustment in question involves the abandonment by Vortex of the home security system which it had installed in petitioners' residence. Respondent determined that abandonment of the security system constituted a distribution of property in the amount of $ 23,786 to petitioners with respect to their stock in Vortex. [5] OPINION Respondent's determination *353 that the abandonment of the security system constituted a distribution of property with respect to petitioners' Vortex stock is unchallenged. Petitioners argue only that respondent erroneously determined the amount distributed. Petitioners contend that the system's failure to operate in a reliable manner caused it to be worthless or, if not completely worthless, worth only a fraction of the amount of the settlement which Vortex paid to ADT. Respondent, on the other hand, contends that petitioners have failed to prove that the home security system was worthless. Respondent further contends that petitioners have failed to prove that his determination of the amount of the distribution was erroneous. [6]
The applicable law is clear. Section 301(a)[7] generally provides that the distribution of property made by a corporation to a shareholder with respect *354 to its stock shall be taxed to the shareholder in the manner prescribed by section 301(c). Section 301(c)(1) provides that any portion of the distribution which is a dividend as defined in section 316 shall be included in the income of the shareholder. Section 301(c)(2) provides that any portion of a distribution which is not a dividend shall be applied to reduce the shareholder's basis in the stock and, pursuant to section 301(c)(3), that portion of the distribution which is not a dividend and which exceeds the shareholder's basis generally shall be treated as a capital gain. Under section 301(b), the amount of a distribution other than money equals the fair market value, as of the date of distribution, of the property distributed. Sec. 301(b)(1)(A) and 301(b)(3). Fair market value is inherently a question of fact resolved by weighing all of the relevant evidence in the record and drawing appropriate inferences therefrom. Estate of Gilford v. Commissioner, 88 T.C. 38, 50 (1987); *355 Coates Trust v. Commissioner, 55 T.C. 501, 514 (1970), affd. 480 F.2d 468 (9th Cir. 1973), cert. denied 414 U.S. 1045 (1973). The accepted standard for measuring "fair market value" is the price at which the property would change hands between a hypothetical willing buyer and seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts. See United States v. Cartwright, 411 U.S. 546, 551 (1973). However, respondent's determination of value is presumptively correct, and petitioners bear the burden of showing it to be in error. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). The record contains ample evidence of the shortcomings of the home security system Vortex had installed at petitioners' residence. It required repeated repairs which were never completely successful and it was sometimes turned off for several days at a time. Nevertheless, petitioners continued to use that security system until it was partially replaced with a better functioning system 4 or 5 years later. Thus, the home security system which Vortex distributed to petitioners was neither completely inoperable nor completely worthless at the time it *356 was distributed to them. We do not, however, agree with respondent's determination of that system's value. In making his argument, respondent equated the value of the home security system with its contract price of $ 18,443. Ordinarily, the price at which the same or similar property has changed hands is persuasive evidence of fair market value. Grill v. United States, 303 F.2d 922, 927 (Ct. Cl. 1962); Staley v. Cmmissioner, 41 B.T.A. 752, 769 (1940). Where the parties to the sale have dealt at arm's length and the sale occurred in reasonable proximity to the valuation date, the price agreed upon is considered to have been an accurate reflection of market conditions. However, a determination based upon contract price is not appropriate in this instance because Vortex did not pay that price for the security system installed at petitioners' residence. The only amount Vortex paid ADT was the amount which it paid in connection with settlement of the litigation commenced by Vortex on account of a problem with the television monitoring equipment installed at Schrott's residence. Although Vortex filed its complaint against ADT without allegations regarding the shortcomings of the system *357 installed at petitioners' residence, the settlement agreement provided for the mutual release of all of the parties who had a claim with respect to either system. Vortex paid ADT $ 10,700 in complete satisfaction of its obligation to that corporation for installing security systems at the residences of both petitioners and Schrott which had contract prices of $ 18,443 and $ 45,858, respectively. The settlement agreement did not however provide any allocation of that amount between the two security systems. Petitioners argue that allocation of the amount of the settlement should be made according to the ratio of the contract price of the system installed at their residence to the total contract price of $ 64,301. We do not agree. An allocation based upon relative contract price is not warranted because the litigation which resulted in payment of the amount of the settlement destroyed the integrity of those prices. Vortex neither received nor paid for the security systems for which it contracted. Instead, Vortex received, and subsequently distributed, two security systems for which it paid ADT a total of $ 10,700. We find that that amount reflects the aggregate value of both the *358 home security system which ADT installed at petitioners' residence and the work which ADT performed on the system installed at Schrott's residence. Because the respective values of those systems cannot be ascertained from the record, we must exercise our best judgment in determining the fair market value of the home security system here in question. Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930). We cannot assume that the entire amount which Vortex paid to ADT was attributable to either the system installed at petitioners' residence or the work which ADT performed on Schrott's system. Although installation of the home security system at Schrott's residence required the performance of a substantial amount of work by contractors other than ADT, we find that the work performed by ADT contributed to the value of that system. ADT, on the other hand, installed a complete home security system at petitioners' residence. Petitioners used that system for 4 or 5 years before a decision was made to replace it. At that time, the home security system was only partially replaced; new controls were installed in place of those installed by ADT. In exercising our best judgment, and resolving *359 all doubts and inexactitude against petitioners, we conclude that the fair market value of the home security system which petitioners received from Vortex was $ 8,250. Cohan v. Commissioner, supra.
BACKGROUND FACTS -- REMAINING ISSUES For a number of years prior to June 1974, Robert Dale Johnson (Johnson) operated a fraudulent pyramid-type investment scheme to bilk would-be investors out of funds they believed they were investing in industrial wine. [8] Johnson promised investors the return of their original investments, plus a profit of approximately 40 percent thereon, within 6 to 8 months. Instead of using the investments to purchase wine, Johnson financed the returns promised to earlier, less numerous investors whose "wine contracts" [9] *360 became due with the funds of those who invested later. In June 1974, the Securities and Exchange Commission (SEC) exposed Johnson's fraudulent scheme and the investment pyramid collapsed. Winona W. Schrott conducted the petitioners' financial affairs and Schrott acted as their financial advisor. Schrott also served as president of Schrott, Whitaker and Douglas, Inc. (SWD), a small investment advisory firm he owned together with petitioners. In 1970, petitioners and Schrott gained control of Computer Age Industries, Inc. (CAI), a publicly traded corporation, by exchanging their stock in SWD for that corporation's stock. The minority interest in CAI was owned by individuals and entities unrelated to the Schrott family. CAI, which subsequently changed its name to Vortex, became increasingly involved with investments *361 in wine contracts for the accounts of its clients and for its own account. As majority shareholders, directors, and officers of Vortex, petitioners and Schrott exercised significant control over that corporation. Schrott was the chairman of Vortex's board of directors and its chief executive officer. Petitioners were vice presidents of Vortex and Winona W. Schrott was secretary and treasurer. In 1972, Vortex hired Johnson as an executive vice president, primarily to ensure a continued supply of wine contracts for its clients and itself. Of the total wine contracts sold prior to June 1974, Johnson placed approximately 25 percent of them himself. Vortex placed approximately 30 to 35 percent with its clients, and other promoters unaffiliated with Vortex placed the remainder. Johnson never charged petitioners, or any other investors, a brokerage, administrative, or other fee for entering into a wine contract with him directly. Vortex promoted the sale of wine contracts to clients as a major part of its business. Vortex charged its clients fees for the services it rendered in connection with putting the wine contract investments together. The amount of the fee charged by Vortex *362 depended upon the yield of the underlying wine contract. Upon receiving notification from Johnson regarding the availability of a wine contract, Vortex contacted clients who had expressed an interest in making an investment therein. Vortex helped its clients arrange financing and put all of the loan documentation together. Vortex's clients typically borrowed the funds necessary to make an investment from the United Virginia Bank (UVB)[10] and executed in its favor a promissory note (Investor Note) secured by the underlying wine contract. Those same clients typically executed a promissory note (Fee Note) in favor of Vortex which allowed them to pay Vortex's fees out of the wine contract proceeds. Vortex could convert the Fee Notes to cash by discounting them at UVB. When the wine contracts became due, Vortex oversaw repayment of the outstanding Investor Notes and Fee Notes and disbursement of the remainder of the wine contract proceeds to its clients. Initially, clients investing in wine contracts *363 invested in their individual capacities. Vortex later organized limited partnerships for use by its clients as investment vehicles. For clients outside the Schrott family, Vortex organized partnerships for the purpose of purchasing a single wine contract. Each of these partnerships was identified as a particular "Group" by reference to its date of organization. One of Vortex's subsidiaries, usually Canal Corporation or Resource Evaluation and Development, Inc., acted as the general partner and the limited partnership interests were offered for sale to Vortex's clients. They typically borrowed the funds necessary to purchase those interests from UVB. The partnerships utilized the proceeds from the sale of their limited partnership interests to purchase wine contracts. A Fee Note was usually executed by the partnerships for payment of the fees Vortex charged for investing in wine contracts through it. The partnerships were dissolved after collection and distribution of the wine contract proceeds. Petitioners first became involved in Johnson's scheme in 1968 when Winona W. Schrott purchased their first wine contract from him. Petitioners invested substantial sums of money in *364 Johnson's wine contracts in the succeeding years. Beginning in the 1970's, petitioners invested in wine contracts through Vortex rather than dealing directly with Johnson. Vortex charged petitioners the same fee it charged its other clients. Like other Vortex clients, petitioners initially invested in the wine contracts in their individual capacities, and later petitioners utilized limited partnerships organized by Vortex for their investment purposes. This arrangement enabled UVB to extend the credit limits beyond those otherwise allowed because the partnerships rather than the individuals did the borrowing. For members of the Schrott family, [11] Vortex organized partnerships for repeated rather than single investments in wine contracts. The name of each of these partnerships consisted of an identifying word followed by the word "Associates." Vortex charged the same fee regardless of whether petitioners purchased the wine contracts in their individual capacities or through limited partnerships. After the SEC exposed his wine contract scam in June 1974, Johnson pled guilty *365 to various violations of mail and securities fraud statutes. Petitioners incurred a substantial loss on their investment in the wine contracts on which Johnson defaulted after exposure of his scam. Petitioners deducted as a theft loss, the sums of $ 855,000 and $ 200,048, aggregating $ 1,055,048, on their 1974 Federal income tax return. Much of the amount lost had been borrowed from UVB which held Investor Notes issued by petitioners in the amount of $ 757,000. [12]UVB also held Fee Notes in the amount of $ 111,840 which petitioners had issued to Vortex. We assume that petitioners took no deduction in 1974 with respect to Fee Notes issued by them which remained outstanding after the close of that tax year. Issue 2 - Discharge of Petitioner's Indebtedness FINDINGS OF FACT Background
After exposure of the wine contract scam, UVB held Investor Notes and Fee Notes totaling $ 4,499,980. Of that amount, the promissory notes executed by petitioners totaled $ 868,840 and the promissory *366 notes executed by Vortex and Schrott totaled $ 743,000 and $ 1,183,400, respectively. In August 1974, UVB filed suit in the United States District Court for the Eastern District of Virginia against petitioners and five other named defendants, including Schrott and Vortex, seeking recovery of the face amount of the outstanding promissory notes based upon allegations of Federal and state securities law violations and common law fraud. In October 1974, petitioners and Schrott answered UVB's complaint and filed a counterclaim against that bank also alleging violations of Federal and state securities law and common law fraud. Vortex filed a similar answer and counterclaim against UVB. UVB and some of the defendants named in the suit, including petitioners, Schrott, and Vortex, reached an agreement in April 1975 releasing and discharging each other from liability under the complaint and counterclaims. The settlement agreement was made contingent upon a settlement being reached in litigation, described below as the Lenora Johnson Litigation, which was settled in July 1975. The settlement agreement provided for the cancellation of the Investor Notes and Fee Notes held by UVB which petitioners, *367 Schrott, Vortex, and certain of their corporate and partnership affiliates had previously issued. In exchange, petitioners, Schrott, and Vortex agreed to issue new promissory notes in amounts less than the total of those cancelled by UVB. The new notes were secured by collateral described in the settlement agreement, including various assets owned by petitioners, Schrott, Vortex, and other members of the Schrott family. Petitioners made no payments on their outstanding Investor Notes or Fee Notes between the time that UVB filed the suit and the time the settlement agreement was implemented on August 4, 1975. Implementation of that agreement resulted in the execution by petitioners of a promissory note in the amount of $ 700,000 and the cancellation of their Investor Notes and Fee Notes totaling $ 868,840. Neither the settlement agreement nor the promissory note issued by petitioners made any reference to the nature of the underlying indebtedness. On their 1975 Federal income tax return, petitioners reported income from the forgiveness of UVB indebtedness in the amount of $ 33,000. In his notice of deficiency, respondent determined that the entire amount of the forgiven debt, *368 $ 168,840, was includable in petitioners' income; accordingly, he increased their taxable income for 1975 by $ 135,840. Petitioners' Solvency
Vortex acquired various operating subsidiaries as the other significant aspect of its business. Vortex acquired Columbia Products, Inc. (Columbia), a small industrial equipment manufacturer, for $ 448,870 in 1971. Vortex acquired both Richmond/Stancraft Corporation and Metalcrafters of Richmond, Inc. (Metalcrafters) in 1973. Johnson oversaw the operations of Columbia from the time Vortex hired him until he purchased Columbia from Vortex in October 1973 through Parkwood Corporation (Parkwood), a corporation which he had incorporated specifically for that purpose. A friend of Johnson, Jack O. Friedman, incorporatedParkwood and acted as its president. Vortex sold Columbia to Parkwood for $ 1,200,750 payable in the following manner: Cash deposit in the amount of $ 290,000, assumption of the promissory note which Vortex issued to the prior owner of Columbia (Vortex Note) in the amount of $ 167,750, and issuance of a promissory note (Parkwood Note) in the amount of $ 743,000. All of Columbia's stock and all of its assets secured the Parkwood *369 Note which was payable in three annual installments commencing in October 1974. However, that security interest was subordinated to the security interest retained by the prior owner pursuant to the security agreement and escrow agreement Vortex executed in conjunction with the Vortex Note. After exposure of the wine contract scam, petitioners and Schrott filed an action forcing Johnson into bankruptcy. In December 1974, petitioners filed a "Proof of Claim and Acceptance" in the amount of $ 453,832 against Johnson; petitioners filed an additional claim in the amount of $ 1,205,000. Attached thereto were copies of the wine contracts invested in by petitioners upon which Johnson had defaulted after exposure of his scam. The bankrupt estate of Johnson consists of assets valued at approximately $ 1,800,000 while the claims against that estate total approximately $ 23,000,000. Petitioners continue to pursue their claim against Johnson's bankruptcy estate even though an Internal Revenue Service claim could consume all of the available assets. Following exposure of the wine contract scam and the commencement of bankruptcy proceedings against Johnson, the bankruptcy court appointed a trustee *370 to take charge of the assets comprising Johnson's estate, including the stock of Columbia. In August 1974, Vortex requested that the bankruptcy court determine the validity, priority, and extent of its security interest in the stock and assets of Columbia. The matter subsequently came before that court on Johnson's "Application For Authority To Compromise Controversy And Enter Into Agreement Regarding Assets." By order dated December 18, 1974, the bankruptcy court authorized a reduction in the amount of the Parkwood Note from $ 743,000 to $ 400,000 and the following modification of its terms: The remaining unpaid moneys owed by Parkwood to Vortex are $ 400,000. Said sum shall be evidenced in a promissory note of Parkwood, payable in annual increments of $ 40,000 each commencing June 30, 1975, with interest on the unpaid balance computed at 5% per annum to commence from October 1, 1974, and a final (fifth) installment of $ 240,000 plus interest thereon being payable on June 30, 1979. The terms of the security interest of Vortex in the stock and assets of Columbia shall reflect the above modified obligation of Parkwood * * *. In December 1974, Vortex agreed to reimburse petitioners *371 in the amount of $ 233,319.99, $ 168,319.99 for legal fees paid by petitioners to retain counsel to represent the officers of Vortex in litigation regarding the wine contract scam and $ 65,000 for payments which resulted in the discharge of indebtedness Vortex otherwise would have been obligated to repay. The agreement provided that Vortex would pay the total amount of the reimbursement by assigning the Parkwood Note to petitioners. [13] Because the discounted value of the Parkwood Note exceeded the amount of the reimbursement, petitioners agreed to refund the difference to Vortex after receiving all of the payments on that note. [14] *372 Vortex pledged the stock and assets of Metalcrafters, subordinated to the interest of the three individuals from whom it had been acquired, as security for payment of the reimbursement in the event of its failure or inability to deliver the Parkwood Note to petitioners or Parkwood's default on that note. Under those circumstances, Vortex was obligated to pay petitioners the amount of the reimbursement plus interest on or before June 30, 1979. Financial statements for the fiscal year ended September 30, 1975, indicated that Metalcrafters had a net asset value of $ 490,273 on that date, up from $ 376,010 at the end of the immediately preceding fiscal year. For the fiscal years ended September 30, 1974, and 1975, Metalcrafters reported a profit of $ 127,627 and $ 114,263, respectively. Prior to the fiscal year ended September 30, 1975, Vortex satisfied its obligations in the amount of $ 228,000 to the individuals from whom it had acquired Metalcrafters. In October 1975, after reviewing the financial and operating condition of Columbia, the trustee applied to the bankruptcy court for instructions *373 regarding whether to make further payments toward its purchase. [15] In his application, the trustee recommended that no further payments be made. The bankruptcy court ordered the trustee to stop making payments and authorized him to disclaim his ownership interest in Columbia. After the trustee disclaimed his interest in Columbia, Vortex assigned all of that corporation's stock and assets to petitioners. Petitioners accepted assignment of the stock and assets of Columbia in lieu of assignment of the Parkwood Note which had been repudiated. In conjunction with such assignment, Vortex agreed to provide the personnel and equipment necessary for petitioners to assume ownership of Columbia and return it to profitability. Although Columbia incurred a loss in the fiscal year ended September 30, 1975, under the management of the individuals engaged by the bankruptcy trustee, it was returned to profitability the next year. Petitioners facilitated Columbia's return to profitability by loaning that corporation the cash which it needed to continue its operations. *374 In addition to those loans which totaled $ 76,000, petitioners paid over $ 56,000 on the Vortex Note over the next several years. [16] Vortex also provided the assistance it promised by arranging for Metalcrafters to perform over $ 16,000 worth of services for Columbia free-of-charge. Petitioners changed the corporation's name from Columbia to Reel-O-Matic Systems, Inc. (Reel-O-Matic) prior to selling it to WWS, Inc. (WWS), a Schrott family entity, for $ 540,000 in October 1976. WWS assumed the Vortex Note with a balance of $ 100,000 and agreed to pay the remainder in 10 annual installments of $ 44,000 plus interest. On its financial statements for the fiscal years ended September 30, 1974, through 1977, Reel-O-Matic (f.k.a. Columbia) disclosed the following: Fiscal
Net Income
Net Asset
Year End
or (Loss)
Value
1974
$   36,509
$ 342,456
1975
(239,311)
135,305
1976
7,871
131,691
1977
95,709
227,400
In 1974, petitioners received $ 92,716 in combined salaries from Vortex, *375 and in the following year their combined salaries amounted to $ 73,033. By statement dated June 2, 1975, petitioners reported a net worth of $ 392,660 to the SEC in connection with its investigation of their involvement in the wine contract scam. That statement included the following list of petitioners' assets and liabilities: ASSETS:
Cash on Hand and on Deposit
$    47,318
Notes Receivable
485,000
Marketable Securities at Cost - net of
margin balance
109,119
Cash Value of Life Insurance
2,500
Real Estate - Market Value
822,000
Interest in Owned Business (Vortex Stock)
31,223
Automobiles
16,000
Personal Property
55,000
Total Assets
$ 1,568,160
LIABILITIES:
Notes Payable to Banks
$   869,500
Loans Against Real Estate
201,000
Accounts Payable
5,000
Taxes Due and Unpaid (estimated)
100,000
Total Liabilities
$ 1,175,500
NET WORTH
$   392,660
The Parkwood Note is included in the "Notes Receivable" at its face value of $ 400,000. Petitioners held other interests in conjunction with that note which were not separately identified or accounted for on the statement submitted to the SEC. Those interests include a security interest in the stock and assets of Columbia and Vortex's obligation to make the reimbursement in the *376 amount of $ 233,319.99 in the event of its failure or inability to deliver the Parkwood Note to petitioners or Parkwood's default on that note. Petitioners also held a security interest in the stock and assets of Metalcrafters with which Vortex secured its obligation to reimburse them under the circumstances described. The Parkwood Note and the interests held in conjunction therewith were worth not less than $ 233,319.99, the amount of the reimbursement which Vortex agreed to make by assigning that note to petitioners. The "Notes Payable to Banks" included petitioners' post-discharge indebtedness to UVB in the amount of $ 700,000, rather than $ 868,840, even though the agreement resulting in the discharge was not implemented until several months after the statement date. OPINION Insolvency Argument
Pursuant to the settlement agreement, UVB cancelled petitioners' Investor Notes and Fee Notes totaling $ 757,000 and $ 111,840, respectively. [17] In return, petitioners executed a promissory note in the amount of $ 700,000 which made no reference to the nature of the underlying indebtedness. In the absence of evidence to the contrary, we conclude that the composition of the discharged *377 debt and the settled debt is the same as that of the total debt prior to discharge, 87 percent Investor Notes ($ 757,000/$ 868,840) and 13 percent Fee Notes ($ 111,840/$ 868,840). Accordingly, the discharged debt in the amount of $ 168,840 consisted of 87 percent Investor Notes ($ 146,891) and 13 percent Fee Notes ($ 21,949). Similarly, the settled debt in the amount of $ 700,000 consisted of 87 percent Investor Notes ($ 609,000) and 13 percent Fee Notes ($ 91,000). Because the parties herein dispute the tax treatment of the discharge of indebtedness, we must decide whether petitioners must recognize income in the amount of $ 168,840, the difference between the total of the cancelled notes and the amount of the note petitioners issued to UVB in connection with the settlement. [18] *378 In United States v. Kirby Lumber Co.,284 U.S. 1 (1931), the Supreme Court announced the general rule, subsequently codified as section 61(a)(12), that gross income includes income from the discharge of indebtedness. An exception to that rule provides that a debtor realizes no income from the discharge of indebtedness if he is insolvent both before and after the discharge.[19] *379 See Danenberg v. Commissioner,73 T.C. 370, 388 (1979), and cases cited thereat. Under such circumstances, no income is realized because the discharge of indebtedness does not free-up or otherwise make assets available to the debtor. Quinn v. Commissioner,31 B.T.A. 142, 145 (1934); cf. United States v. Kirby Lumber Co.,supra at 3. However, a debtor who is insolvent before the discharge realizes income to the extent such discharge renders him solvent. Conestoga Transportation Co. v. Commissioner,17 T.C. 506, 513 (1951); Texas Gas Distributing Co. v. Commissioner,3 T.C. 57, 61-62 (1944). Neither party disputes any of the principles set forth in the preceding paragraph. Rather, the parties dispute the factual issue of whether petitioners were insolvent before and after the discharge of indebtedness which occurred on August 4, 1975. Petitioners claim that they were insolvent both before and after such discharge. Respondent contends that the evidence in the record contradicts petitioners' claim of insolvency. The burden of establishing that the insolvency exception applies is upon petitioners. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Petitioners provided a statement of assets and liabilities dated June 2, 1975, to the SEC in the course of its investigation of the wine contract scam. Although such statement indicated that their net worth was $ 392,660, petitioners argue that they were insolvent by $ 38,563 after the discharge of indebtedness which culminated on August 4, 1975, with the cancellation of petitioners' old obligations and the execution of a new obligation. [20] *380 In attempting to explain this discrepancy, petitioners claim that the Parkwood Note with a face value of $ 400,000 and their Vortex stock in the amount of $ 31,223 were actually worthless. In all other respects, petitioners rely upon the values of the assets and liabilities listed on such statement in attempting to establish their insolvency. To prove that they were insolvent, petitioners must show that the combined value of the Parkwood Note and their Vortex stock did not exceed the amount by which they claimed to have been insolvent because that claim depended upon both of those assets being considered worthless. Petitioners claimed that they were insolvent by $ 38,563 after the discharge of indebtedness. That purported post-discharge insolvency translates to a purported predischarge insolvency of $ 207,403 because the discharge increased petitioners' net worth by $ 168,840, the amount of the discharged debt. Thus, if the combined value of the Parkwood Note *381 and their Vortex stock exceeded $ 207,403, petitioners were not insolvent before the discharge of indebtedness. Petitioners argue that the Parkwood Note was worthless because of Parkwood's [21] inability to make payments on it and because the property which secured that note, the stock and assets of Columbia, was also worthless. Petitioners further argue that the pledge of the stock and assets of Metalcrafters provided no security for payment of the reimbursement in the amount of $ 233,319.99 which Vortex agreed to make by assigning them the Parkwood Note. While there was some doubt about whether any further payments would be made on the Parkwood Note, we do not agree that the property which secured it was worthless immediately before the discharge. Nor do we agree that Vortex's pledge of the stock and assets of Metalcrafters provided no security for payment of the amount of the reimbursement Vortex agreed to make by assigning petitioners the Parkwood Note. Petitioners argue in the alternative that "Even if the Parkwood Note had any value, that value could not benefit *382 petitioners, who were forced to pledge their rights to the Note and any security for the Note to United Virginia [Bank] as part of the settlement which closed on August 4, 1975." With respect to petitioners' alternative argument, we note that before the discharge UVB had no interest in the Parkwood Note or any of the other assets pledged as collateral for the settled debt of petitioners, Schrott, and Vortex. Thus, in determining whether petitioners were insolvent before the discharge, we disregard the fact that pursuant to the settlement agreement UVB was granted a security interest in certain of petitioners' assets and certain other assets in which petitioners held an interest, including the Parkwood Note, their Vortex stock, their personal residence, and the stock and assets of Metalcrafters in which they held a security interest. For purposes of determining the value of the Parkwood Note, we consider the likelihood of petitioners' receiving payment with respect to that note to be as important as theer receiving payment on it. Petitioners held other valuable interests in conjunction with that note which we consider to be part of its value, including a security interest in the stock *383 and assets of Columbia and the right to receive payment in the amount of $ 233,319.99 from Vortex in the event of its failure or inability to deliver the Parkwood Note to them or Parkwood's default on that note. Vortex secured its obligation to pay petitioners under the circumstances described by pledging the stock and assets of Metalcrafters to them. The value of the Parkwood Note must at least reflect the value of the other interests held by petitioners in conjunction therewith. After an examination of the facts in this case, we conclude that the value of the Parkwood Note immediately before the discharge was not less than the reimbursement in the amount of $ 233,319.99 which Vortex agreed to make by assigning petitioners that note. Even assuming that default was inevitable, petitioners still had the prospect of receiving payment with respect to the Parkwood Note out of the stock and assets of Columbia which secured that note or from Vortex which secured its obligation to make such payment by pledging the stock and assets of Metalcrafters to them. Petitioners attribute the purported worthlessness of Columbia to the "blatant mismanagement, if not fraud, by interim managers appointed *384 to run [Columbia] while the bankruptcy court litigated Mr. Johnson's estate." Although it incurred a loss for the fiscal year ended September 30, 1975, under the management of the individuals engaged by the trustee, Columbia cannot be considered to have been worthless solely on that basis. After the trustee defaulted and relinquished his interest, Vortex immediately assigned petitioners the stock and assets of Columbia. Petitioners, with the assistance of Vortex, returned Columbia to profitability. Petitioners loaned Columbia $ 76,000, made payments on the Vortex Note, and sold Columbia to WWS, a company affiliated with the Schrott family, for $ 540,000 less than 1 year after the bankruptcy trustee relinquished his interest. Those acts contradict petitioners' contention regarding the worthlessness of the stock and assets of Columbia. Because petitioners' security interest was subordinated to the prior interest of the holder of the Vortex Note, we conclude that the value of the stock and assets of Columbia must have exceeded the $ 140,000 balance due on the Vortex Note by a substantial amount; otherwise, neither the loans to Columbia nor the payments on the Vortex Note would have *385 been made by petitioners. Neither party argued that the subsequent sale of Columbia did not occur at arm's length. Notwithstanding that possibility, we find nothing in the record suggesting that petitioners and WWS agreed upon an inflated price. In the absence of evidence of change or improvement, a subsequent sale of the property can be found to reflect the fair market value of such property on an earlier valuation date. See Estate of Kaplin v. Commissioner,748 F.2d 1109, 1111 (6th Cir. 1984), revg. on other grounds a Memorandum Opinion of this Court. Petitioners failed to introduce evidence of change or improvement sufficient to explain the difference between the price paid for Columbia in October 1976 and its purported worthlessness on August 4, 1975. Accordingly, the subsequent sale of Columbia supports our conclusion that its stock and assets were of substantial value both on the date of such sale and the earlier date on which the debt to UVB was discharged. In reaching that conclusion, we gave serious consideration to Schrott's testimony regarding the worthlessness of the stock and assets of Columbia and found that testimony to be unpersuasive. We do not, however, find *386 it necessary to quantify this substantial value since the value of the Parkwood Note reflects Vortex's obligation to reimburse petitioners in the amount of $ 233,319.99 which alone is sufficient to make them solvent before the discharge. Because the assets of Metalcrafters were encumbered by obligations due to the individuals from whom Vortex acquired its stock, petitioners assert that the pledge of such stock and assets offered no security for payment of the reimbursement by Vortex. To the contrary, the record reveals that those obligations in the amount of $ 228,000 which encumbered the assets of Metalcrafters at the time of the pledge were satisfied prior to September 30, 1975. Petitioners failed to introduce evidence from which it can be determined whether those obligations were satisfied before or after August 4, 1975. Therefore, we presume that such evidence would have revealed an earlier satisfaction. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Thus, we find that on the date in question petitioners' security interest was not subordinated to the interest of the individuals from whom Vortex acquired Metalcrafters. *387 Furthermore, the assets of Metalcrafters appeared sufficient to secure payment of obligations well in excess of $ 228,000. On September 30, 1974, Metalcrafters had a net asset value of $ 376,010 which climbed to $ 490,273 by the end of the next fiscal year. Metalcrafters also operated at a profit during the years under consideration. Accordingly, we conclude that the stock and assets of Metalcrafters secured payment of the reimbursement in the amount of $ 233,319.99 by Vortex in the event of its failure or inability to deliver the Parkwood Note to petitioners or Parkwood's default on that note. Petitioners also argue that their Vortex stock was worthless "in view of Vortex liabilities arising out of the wine scandal." Respondent argues, inter alia, that petitioners' assertion regarding the worthlessness of their Vortex stock cannot be reconciled with the net asset value of $ 953,219 which Vortex reported on its consolidated financial statements for September 30, 1975. We agree with respondent. Accordingly, we conclude that the value of petitioners' Vortex stock was not less than $ 31,223, the value which petitioners reported to the SEC just over 2 months prior to the date of *388 discharge. We have examined and weighed all of the evidence bearing on the value of the Parkwood Note and petitioners' Vortex stock. Based upon our consideration of that evidence, and the arguments which the parties made in that regard, we conclude that the assets in question were neither worthless nor of so little value that petitioners were insolvent before the discharge of indebtedness. To prove that they were insolvent before the discharge, petitioners had to show that the combined value of the Parkwood Note and their Vortex stock did not exceed $ 207,403. However, we concluded that the values of the Parkwood Note and petitioners' Vortex stock were not less than $ 233,319.99 and $ 31,223, respectively, or $ 264,542.99 in the aggregate, before the discharge of indebtedness which occurred on August 4, 1975. Petitioners therefore failed to satisfy their burden of proving that they were insolvent before the discharge of indebtedness. That failure precludes application of the insolvency exception because, if petitioners were not insolvent before the discharge, they clearly were not insolvent thereafter. Accordingly, we hold that petitioners realized income in the amount of $ 168,840 *389 resulting from the discharge of indebtedness by UVB. Fee Notes Alternative Argument
Having been found solvent, petitioners maintain that the income from discharged Fee Notes should be excluded under the common law in effect prior to the enactment of section 108(e)(2), which provides that: "No income shall be realized from the discharge of indebtedness to the extent that payment of the liability would have given rise to a deduction." Although section 108(e)(2) applies only with respect to transactions occurring after December 31, 1980, Bankruptcy Tax Act of 1980, Pub. L. 96-589, sec. 7(a)(1), 94 Stat. 3411, petitioners argue that certain tax benefit principles in effect when UVB discharged their indebtedness in 1975 dictate a similar result here. Petitioners' position is "that a recovery should not be includible in income if a current year deduction would have been permitted had the amount actually been paid in the current year." Petitioners argue that payments on Fee Notes would have been deductible under section 212 had those notes not been discharged. Respondent argues that neither section 108(e)(2) nor the common law in effect prior to its enactment precludes the realization of *390 income from discharged indebtedness by reason of an offsetting deduction. Respondent further argues that petitioners are not otherwise entitled to an offsetting deduction under section 212. We know of no authority, nor do petitioners cite any, under which they are entitled to exclude the income from discharge of Fee Notes. Petitioners rely primarily upon statements several commentators made in describing section 108(e)(2). [22] *392 While the wisdom of those commentators cannot be doubted, we do not find their statements to be persuasive authority for the position espoused by petitioners. In particular, petitioners argue on brief that "Under what Professor Eustice identifies as an exclusionary theme from prior law,' the discharged debt should * * * be excluded from their income." However, the "exclusionary theme from prior law" to which Professor Eustice refers applies only in situations where the discharged liability is one which has been accrued and deducted for Federal income tax purposes by an accrual method taxpayer. In such situations, the tax benefit rule provides that cancellation of the unpaid liability results in the realization of taxable income only if, and to the extent that, *391 the taxpayer derived a tax benefit from the prior deduction. See, e.g., Barnhart-Morrow Consolidated v. Commissioner, 47 B.T.A. 590, 600-601 (1942), affd. 150 F.2d 285 (9th Cir. 1945) (no income realized from partial discharge of liability for accrued salary because previous deduction without tax benefit). For respondent's view, see Rev. Rul. 67-200, 1967-1 C.B. 15, clarified Rev. Rul. 70-406, 1970-2 C.B. 16 (taxpayer discharged from accrued interest allowed an exclusion under section 111 to extent prior interest expense deductions resulted in no tax benefit). Neither this approach, dubbed the "deduction approach" by commentators, [23] nor the tax benefit principles underlying it apply here because petitioners are cash method taxpayers who did not previously deduct the expenses for which they issued the subsequently discharged Fee Notes. [24] *393 The tax benefit rule, upon which petitioners attempt to draw by analogy," is both a rule of inclusion and exclusion: recovery of an item previously deducted must be included in income; that portion of the recovery not resulting in a prior tax benefit is excluded." Putoma Corp. v. Commissioner, 66 T.C. 652, 664 n. 10 (1976), affd. 601 F.2d 734 (5th Cir. 1979). Although the tax benefit rule does not literally apply, petitioners assert that under the principles upon which it is founded they should be entitled to exclude the income from discharge of Fee Notes because, as cash method taxpayers, they did not previously deduct the expenses incurred in connection with issuance of those notes. We do not agree. Petitioners overlook the fact that the discharge of indebtedness rule set forth in United States v. Kirby Lumber Co., 284 U.S. 1 (1931), operates without consideration of whether the indebtedness was incurred in connection with deductible, nondeductible, or capital *394 expenditures. Under that rule, an independent reason exists for requiring the amount of discharged indebtedness to be included in income; "to the extent that a taxpayer has been released from indebtedness, he has realized an accession to income because the cancellation effects a freeing of assets previously offset by the liability arising from such indebtedness." Cozzi v. Commissioner, 88 T.C. 435, 445 (1987). In other words, the Kirby Lumber doctrine is premised upon a freeing of assets theory that emphasizes the increase in net worth which the debtor derives from the discharge.[25] *395 United States v. Kirby Lumber Co., supra.In contrast, recovered amounts are taxable under the tax benefit rule not because they increase the taxpayer's net worth but because they are linked to a prior tax benefit. If the prior deduction generated no tax benefit, then no inclusion is required when the amount previously deducted is either not paid or, having been paid, is recovered. Sec. 111. Under Section 108(e)(2), cash method taxpayers can now obtain results somewhat similar to those obtained by accrual method taxpayers under the deduction approach. At the time petitioners were discharged from indebtedness, however, no statutory authorization existed for cash method taxpayers to exclude income from the discharge of indebtedness to the extent that payment of the discharged debt would have given rise to a deduction. [26] Counsel for petitioners have cited several cases in support of the petitioners' position, but none of those cases are on point. Without discussing them in detail, suffice it to say that such cases do not involve the same facts that we have in the instant case, nor do *396 they require us to reach a different result on the facts now before us. We are neither inclined nor authorized to abrogate the Kirby Lumber doctrine by applying tax benefit principles in its stead. Accordingly, we hold that petitioners are not entitled to exclude income from the discharge of Fee Notes. Investor Notes Alternative Argument
Petitioners argue that they are entitled to exclude [27] the income from discharged Investor Notes because they "suffered a loss if and to the extent the discharged debt constitutes recognizable income, as the notes [Investor Notes] were delivered to pay for an asset that was worthless in 1975, the year in which petitioners would be forced to recognize any discharged debt income." Respondent argues that neither section 108(e)(2) nor the common law in effect prior to its enactment precludes the realization of income from discharged indebtedness by reason of an offsetting loss. Respondent further argues that petitioners are not otherwise entitled to an offsetting *397 loss under section 165. In making their argument regarding the Investor Notes, petitioners attempt to tie the tax treatment of the discharge of indebtedness to the fate of the funds which they borrowed to invest in wine contracts. As we noted in connection with our discussion of the Fee Notes, the discharge of indebtedness rule set forth in Kirby Lumber operates independently of such considerations. Notwithstanding the fate of the borrowed funds, petitioners must realize income from discharge of indebtedness because the receipt of funds from UVB in the year that the Investor Notes were issued constituted a nontaxable benefit which would remain untaxed if the discharge of those notes was held to be tax free. Commissioner v. Tufts, 461 U.S. 300, 307 (1983). Moreover, the fate of those funds was accounted *398 for in a prior tax year. The parties stipulated that "petitioners incurred substantial losses from investments in the defaulted wine contracts, including amounts invested that were borrowed from United Virginia Bank * * *." The parties further stipulated that those "amounts were deducted on petitioners' 1974 income tax return as a theft loss." Thus, the theft loss reflected, in part, the loss of funds petitioners borrowed from UVB and invested in wine contracts. UVB subsequently reduced petitioners' out-of-pocket loss by discharging Investor Notes in the amount of $ 146,891. If petitioners can exclude that amount from income, part of the loss on the defaulted wine contracts will be double counted, first in the theft loss deducted in 1974 and again in the exclusion of the income from discharge of Investor Notes in 1975. Obviously, petitioners are not entitled to deduct the same loss twice regardless of whether they repay those notes. Cf. Brenner v. Commissioner, 62 T.C. 878, 884-885 (1974). We cannot interpret the Code to allow double deductions for the same amount "absent a clear declaration of intent by Congress," United States v. Skelly Oil Co., 394 U.S. 678, 684 (1969), and *399 section 165 reflect no such intent. Accordingly, we hold that petitioners are not entitled to exclude any portion of the income from the discharge of Investor Notes nor are they otherwise entitled to an offsetting loss under section 165. Issue 3 - Discharge of Kenilworth's Indebtedness FINDINGS OF FACT A Vortex employee, Frederick M. Sorrell, Jr., acted as general partner of Kenilworth Associates (Kenilworth), one of the limited partnerships through which petitioners invested in wine contracts. The limited partners of Kenilworth, petitioners and Schrott, held profit interests of 99.75 percent and .25 percent, respectively. Kenilworth began purchasing wine contracts after it was formed for that purpose in January 1973. In February 1974, Kenilworth purchased from petitioners for $ 50,000 a wine contract due in September 1974 which petitioners had purchased from Johnson. Petitioners assigned to Kenilworth the $ 50,000 promissory note which had been issued by Johnson in conjunction with that wine contract. To fund the purchase, Kenilworth executed an Investor Note in the amount of $ 50,000 in favor of UVB and used the loan proceeds to pay petitioners in cash. Kenilworth obtained *400 the loan from UVB by pledging as security the $ 50,000 promissory note issued by Johnson and depositing it with that bank. Johnson defaulted on the $ 50,000 promissory note when it became due after exposure of his wine contract scam. Kenilworth deducted the $ 50,000 which it had invested in the underlying wine contract as a theft loss on its 1974 partnership return. Notwithstanding the loss on that particular wine contract, Kenilworth reported income for the year in the amount of $ 64,395; petitioners reported their distributive shares of that income on their 1974 Federal income tax return. UVB listed the $ 50,000 Investor Note issued by Kenilworth as outstanding in the suit it filed in August 1974. UVB cancelled Kenilworth's indebtedness as part of the settlement which was reached in 1975. Kenilworth reported the amount of the cancelled debt as income on its 1975 partnership return. Kenilworth completed Schedules K-1 reflecting each partners' distributive share of that income which was the only item it reported for that year. Petitioners did not report any income (or loss) with respect to their interests in Kenilworth on their 1975 Federal income tax return. In his notice of *401 deficiency, respondent determined that petitioners failed to report for the 1975 taxable year their distributive share of income from the cancellation of Kenilworth's indebtedness. OPINION The parties agree that Kenilworth, a partnership in which petitioners together held a 99.75 percent profits interest, realized $ 50,000 of income as a result of the cancellation of indebtedness which occurred in August 1975, pursuant to the terms of the settlement agreement which was reached with UVB. They do not, however, agree whether petitioners must recognize their distributive share of the income resulting from the cancellation of Kenilworth's indebtedness and, if so, whether petitioners are entitled to an offsetting loss. Petitioners reassert the argument that they did not realize any income on the discharge of indebtedness because they were insolvent immediately thereafter. Petitioners argue, in the alternative, that recognition of their share of such income would increase the bases of their partnership interests, entitling them to an offsetting loss because those interests became worthless during that same year. Respondent argues that petitioners were not insolvent. Respondent further *402 argues that petitioners are not entitled to a loss with respect to their partnership interests because Kenilworth did not terminate during the year at issue. Gross income generally includes income from the discharge of indebtedness. Sec. 61(a)(12); United States v. Kirby Lumber Co., 284 U.S. 1 (1931). Income realized by a partnership on the discharge of indebtedness is passed through to each partner under section 702. Gershkowitz v. Commissioner , 88 T.C. 984, 1005 (1987). [28]
However, an insolvent partner does not recognize income from the discharge of a partnership's indebtedness. Gershkowitz v. Commissioner, supra at 1009. Cf. Danenberg v. Commissioner, 73 T.C. 370, 388 (1979), *403 and cases cited thereat. Kenilworth realized income from the discharge of indebtedness when UVB discharged the $ 50,000 Investor Note. Sec. 61(a)(12). We have already resolved the issue of insolvency against petitioners. Accordingly, we hold that petitioners must recognize 99.75 percent of Kenilworth's income from the discharge of indebtedness under section 702. The allocation to each partner of a partnership's income from the discharge of indebtedness results in a corresponding increase in the basis of each partner's interest under section 705(a)(1)(A). The reduction in a partnership's liabilities caused by a debt discharge results in a deemed distribution to each partner in an amount equal to his share of the discharged indebtedness.[29]Sec. 752(b). Such distribution results in a corresponding reduction of each partner's basis in his partnership interest under section 733(1). Therefore, we reject petitioners' alternative argument regarding an offsetting loss, without deciding whether they would otherwise be entitled to such a loss, because the net effect of the discharge of Kenilworth's indebtedness on the bases of petitioners' partnership interests is zero. Gershkowitz v. Commissioner, supra. *404 Issue 4 - Reimbursement for Legal Expenses FINDINGS OF FACT In August 1974, three people who had invested in wine contracts on which Johnson defaulted, Lenora R. Johnson, C. G. Moody, Jr., and Bernard E. Trainor, filed suit in the United States District Court for the Eastern District of Virginia, seeking the return of their wine contract investments, interest, costs, attorneys' fees, and punitive damages. In their complaint, the investors alleged violations of Federal securities law and state and Federal banking law, breach of contract, negligence, and fraud and misrepresentation against 15 individuals and entities, including Johnson, Schrott, Vortex, and UVB. Although not named in the original complaint, petitioners were subsequently added as defendants because of their roles as directors and officers of Vortex. The next month, an almost identical complaint was filed in the same court by several other investors against eight of the defendants named in the earlier suit and petitioners. *405 A third group of investors took action against some of the same defendants in another suit filed in the United States District Court for the Eastern District of Virginia in 1975. That court consolidated the three cases which will hereinafter be referred to as the Lenora Johnson Litigation. In December 1974, George F. Zverina filed suit, hereinafter referred to as the Zverina Litigation, against Vortex, several of Vortex's subsidiaries, Schrott, and several limited partnerships organized by Vortex through which he had invested in wine contracts. Zverina sought the return of his investments from the defendants based on alleged violations of Federal securities law. Petitioners were neither named in nor added to this suit as defendants. The Zverina Litigation subsequently settled with payment to Zverina by Vortex in the amount of $ 68,390.92. The Lenora Johnson Litigation was settled in July 1975. Under the terms of the settlement agreement, the plaintiffs were to receive a payment in the amount of $ 268,000 in exchange for releasing the defendants from the claims arising out of their wine contract investments. The amount of the settlement, which was subsequently reduced to $ 263,842, *406 was paid by Vortex later that year primarily with the proceeds of a loan from UVB which petitioners and Schrott guaranteed. Vortex deducted the amount paid on its Federal income tax return for the taxable year ended September 30, 1975. Vortex's board of directors discussed the settlement of the Lenora Johnson Litigation at a meeting in November 1975. Schrott informed the other directors in attendance, including petitioners, that Vortex had borrowed $ 250,000 from UVB to pay the amount required by the settlement agreement. Schrott also informed the directors that, although he and petitioners guaranteed the note Vortex issued in that connection, the prime responsibility remained with it, particularly "for tax purposes." The directors passed a resolution acknowledging Vortex's responsibility for the entire $ 250,000 of indebtedness incurred in connection with the settlement of the Lenora Johnson Litigation. By letter addressed to Schrott in his capacity as chairman of Vortex's board of directors, dated November 21, 1975, petitioners offered Vortex $ 117,000 as reimbursement for the cost of the settlement of the Lenora Johnson Litigation. Although petitioners acknowledged that Vortex *407 had previously assumed full responsibility for the entire amount of the settlement, they described the amount of the offered reimbursement as "the share of the settlement which we believe might have been construed to be our expense." Also outlined in their letter was an agreement requiring Vortex to repay the offered amount, or any part thereof, which the Internal Revenue Service subsequently determined not to be an expense deductible by petitioners on their Federal income tax return. Vortex accepted petitioners' offer of reimbursement by resolution of its board of directors dated November 24, 1975. Petitioners reimbursed Vortex in the amount of $ 117,000 and deducted that amount on their 1975 Federal income tax return. Respondent did not challenge this deduction. In February 1976, Vortex loaned petitioners $ 117,000, payable on demand without interest. Vortex included the amount of the reimbursement as income on its Federal income tax return for the taxable year ended September 30, 1976. By letter addressed to Schrott in his capacity as chairman of Vortex's board of directors, dated December 15, 1976, petitioners and Schrott offered to reimburse Vortex for previously incurred costs *408 in the amount of $ 260,232.92. Of that amount, petitioners offered $ 200,232.92 as reimbursement for the remainder of the cost of the Lenora Johnson Litigation settlement, the entire cost of the Zverina Litigation settlement, and $ 3,000 of attorneys' fees incurred by Vortex in connection with the wine contract litigation. [30] *409 Schrott offered $ 60,000 as reimbursement for $ 28,000 of other settlement costs and $ 32,000 for attorneys' fees incurred by Vortex. The total amount of the reimbursement was allocated between petitioners and Schrott based upon their respective abilities to pay. Vortex's board of directors resolved to accept the offer made by petitioners and Schrott on the same day that the offer was extended. Vortex again agreed to repay that portion of the offered amount, if any, which the Internal Revenue Service subsequently determined not to be deductible by petitioners and Schrott. Petitioners borrowed the funds necessary to reimburse Vortex from UVB. On December 16, 1976, petitioners issued personal checks in the amount of $ 150,000 and $ 50,232.92 to Riggs National Bank (RNB) in exchange for cashier's checks of corresponding amounts. That same day, Vortex received those cashier's checks from petitioners as payment of the reimbursement in the amount of $ 200,232.92 and deposited the proceeds at RNB. Also that same day, Vortex issued checks in the amount of $ 150,000 and $ 50,232.92 to RNB in exchange for cashier's checks of corresponding amounts made payable to petitioners. Petitioners deposited the proceeds of those cashier's checks in their account at RNB the day that they were drawn. The next day, petitioners and Schrott, acting on behalf of all five members of the board of directors, [31] ratified Vortex's decision to loan petitioners the $ 200,232.92 payable on demand without interest. Petitioners executed promissory notes in the amount of $ 150,000 and $ 50,232.92, dated December 16, 1976, reflecting their indebtedness to Vortex. Petitioners repaid the amount of those notes *410 to Vortex over the next several years. Vortex included the reimbursement as income on its Federal income tax return for the taxable year ended September 30, 1977. Petitioners deducted the $ 200,232.92 reimbursement on their 1976 Federal income tax return. In his notice of deficiency, respondent disallowed that entire deduction on the grounds that the reimbursement made to Vortex was "not in payment of [petitioners'] expenses but those of Vortex Corporation, and as such constitute either a loan or contribution of capital to Vortex." OPINION Petitioners maintain that they are entitled to deduct the $ 200,232.92 reimbursement purportedly made to Vortex for certain legal expenses, including settlement costs and attorneys' fees, incurred in connection with the wine contract scam. [32]
Petitioners *411 argue that they should be allowed such a deduction because they believed themselves to be personally liable for the underlying legal expenses. Petitioners argue in the alternative that, even if they were not liable for the legal expenses, they should be allowed to deduct the reimbursement because it constituted an expense incurred by them in their capacities as officers of Vortex. Petitioners also argue that the reimbursement is deductible because it was necessary to protect their business reputations. Respondent, on the other hand, argues that the reimbursement of legal expenses is not deductible by petitioners because those expenses were not incurred by them in carrying on a trade or business. Respondent further argues that no deduction is allowable even if petitioners incurred the legal expenses in their business because the reimbursement constituted a sham transaction not resulting in payment of those expenses in 1976. Regardless of the nature of the underlying expenses petitioners are not entitled to a deduction in 1976 unless they actually paid the amount of the reimbursement in that year. Sec. 461(a); sec. 1.461-1(a)(1), Income Tax Regs. Because petitioners are cash method *412 taxpayers, they are entitled to deductions only for otherwise deductible expenses paid during the taxable year. Respondent asserts that the immediate loan-back of the exact amount of the reimbursement by Vortex to petitioners resulted in no payment being made by petitioners in 1976. Respondent also asserts that petitioners engaged in the carefully orchestrated loan transaction with Vortex solely for the purpose of giving the reimbursement and loan-back the appearance of being two separate transactions which, when viewed together, reveal that petitioners in effect issued a note to Vortex promising to pay the amount of the reimbursement at a later date. Petitioners contend that they paid Vortex the amount of the reimbursement in 1976 with funds borrowed from UVB and that they are therefore entitled to a deduction in that year notwithstanding the fact that Vortex immediately loaned them an identical amount. In Eckert v. Burnet, 283 U.S. 140 (1931), a taxpayer who became liable on a corporate note that he had previously endorsed issued a personal note in exchange for the cancellation of the corporate note. The Supreme Court held that the issuance of a note by a cash method taxpayer, *413 without any disbursement of cash or property having a cash value, does not give rise to a deduction. Eckert v. Burnet, supra at 141; see also Helvering v. Price, 309 U.S. 409 (1940). However, the actual payment of an expense with funds borrowed from a third party gives rise to a current deduction. McAdams v. Commissioner, 15 T.C. 231, 235 (1950), affd. 198 F.2d 54 (5th Cir. 1952). Under such circumstances, the deduction is not postponed until the year in which the borrowed money is repaid; rather, such expenses must be deducted in the year they are paid. Granan v. Commissioner, 55 T.C. 753, 755 (1971); McAdams v. Commissioner, supra.Thus, the critical question here is whether the immediate loan-back of the exact amount of the reimbursement negated what otherwise would have constituted payment of the reimbursement by petitioners in 1976 with the proceeds of a third-party loan. Courts disregard as shams those transactions that lack economic substance and are conducted solely for purposes of reducing tax liability. Knetsch v. United States, 364 U.S. 361 (1960); Falsetti v. Commissioner, 85 T.C. 332 (1985). The economic substance of a transaction, not its form, controls for purposes *414 of Federal tax. Gregory v. Helvering, 293 U.S. 465 (1935); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1236 (1981). In Frank Lyon Co. v. United States, 435 U.S. 561 (1978), the Supreme Court stated that: The Court has never regarded "the simple expedient of drawing up papers," * * *, as controlling for tax purposes when the objective economic realities are to the contrary. "In the field of taxation, administrators of the laws and the courts are concerned with substance and realities, and formal written documents are not rigidly binding." * * * Nor is the parties' desire to achieve a particular tax result necessarily relevant. * * * [Citations omitted.] Frank Lyon Co. v. United States, supra at 573. Based on the foregoing principles, we defined a "sham in substance' as the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." Falsetti v. Commissioner, supra at 347. In this case, the objective economic realities are such that petitioners suffered no economic detriment, i.e., an actual depletion of their property, as a result of reimbursing Vortex and *415 immediately borrowing back the same amount from it. Saviano v. Commissioner, 80 T.C. 955, 964 (1983), affd. 765 F.2d 643 (7th Cir. 1985). Although they subsequently paid their note, petitioners gave up nothing at the time of the reimbursement except their promise to pay. Don E. Williams Co. v. Commissioner, 429 U.S. 569, 578 (1977); Hart v. Commissioner, 54 F.2d 848, 852 (1st Cir. 1932), affg. on this issue 21 B.T.A. 1001 (1930). Therefore, we disregard the reimbursement petitioners made to Vortex in 1976 because the economic substance of that reimbursement was not consonant with its intended tax effect. See James v. Commissioner, 87 T.C. 905, 918 (1986), citing Frank Lyon Co. v. United States, supra at 573 and Knetsch v. United States, supra at 366. Courts typically disregard check swaps or other types of exchange which create only the illusion of payment. See, e.g., Knetsch v. United States, supra; United States v. Clardy, 612 F.2d 1139 (9th Cir. 1980). The superficial payment structure petitioners employed in this case resembles the check and loan swapping mechanism created by the taxpayers in Battelstein v. Internal Revenue Service, 631 F.2d 1182 (5th Cir. 1980) (en banc), *416 cert. denied 451 U.S. 938 (1981), solely to reap tax benefits. In Battelstein, the court flatly rejected the claimed interest deduction where the borrower issued a check to the lender in the amount of the interest due and the lender, in return, loaned the borrower an amount sufficient to cover the interest payment. Battelstein v. Internal Revenue Service, supra at 1184-1185; cf. Burgess v. Commissioner, 8 T.C. 47 (1947). In this case, petitioners and Vortex exchanged cashier's checks of equal amounts on the same day. Vortex received the cashier's checks as payment of the reimbursement. The cashier's checks petitioners received represented the proceeds of the loan which the parties formalized the day after the exchange; Vortex's directors ratified the corporation's decision to make the loan; and petitioners executed demand notes promising to repay the amount borrowed without interest. We do not view the exchanges of cashier's checks as separate transactions because petitioners have not shown that any purpose existed for the loan other than the immediate return of their funds from Vortex. Cf. Battelstein v. Internal Revenue Service, supra.Therefore, the purported reimbursement *417 of Vortex does not constitute a "payment" by petitioners in 1976. Contrary to petitioners' contentions, their deduction is not saved by the rule that, where a taxpayer borrows money from a third party to pay deductible expenses, such expenses are considered paid. See, e.g., Granan v. Commissioner, 55 T.C. 753, 755 (1971); McAdams v. Commissioner, 15 T.C. 231, 235 (1950), affd. 198 F.2d 54 (5th Cir. 1952). In the usual third-party situation, a deduction is appropriate because the obligation to pay the deductible expense has not been postponed, it has been extinguished. A default by the taxpayer would not revive that obligation. Crain v. Commissioner, 75 F.2d 962, 964 (8th Cir. 1935), affg. an unreported order of this Court. The circumstances are different however where, as here, the taxpayer "pays" expenses with funds borrowed from a third party and then immediately borrows that same amount back from the payee. In such a situation, the taxpayer's obligation to the payee remains. The taxpayer has merely postponed payment of the underlying expenses by issuing a note promising payment in the future. As the Supreme Court stated in Minnesota Tea Co. v. Helvering, 302 U.S. 609, 613 (1938), *418 "A given result at the end of a straight path is not made a different result because reached by following a devious path." Upon full review of the record, we conclude that the $ 200,232.92 reimbursement of Vortex in 1976 was devoid of economic substance because petitioners made such reimbursement solely to form the basis for a tax deduction in that year. Accordingly, we hold that petitioners are not entitled to deduct the amount of the reimbursement on their 1976 Federal income tax return regardless of the nature of the underlying expenses. Petitioners presented at trial and on brief the alternative argument that the reimbursement is deductible in 1977 and 1978, the years in which they made payments on the promissory notes executed the day after the reimbursement. In the statutory notice issued in this case covering the years 1973, 1975, and 1976, respondent did not determine a deficiency for either 1977 or 1978; consequently, neither of those years is now before us. Nevertheless, petitioners argue that the mitigation provisions of the Internal Revenue Code, sections 1311 through 1314, permit us to make adjustments in their 1977 and 1978 tax liability. Petitioners' reliance on the *419 mitigation provisions is misplaced. For those provisions to apply there must have been "a decision by the Tax Court or a judgment, decree, or other order by any court of competent jurisdiction, which has become final. " Sec. 1313(a)(1) (emphasis added). A decision of this Court becomes final "Upon the expiration of the time allowed for filing a notice of appeal, if no such notice has been duly filed within such time." Sec. 7481(a)(1). The framework of the mitigation provisions envisions an ultimate determination of the tax liability for 1 year before any adjustments with respect to that determination are made to other years. No such determination has yet been made in this case, therefore, the mitigation provisions are clearly inapplicable. [33]
Even if we were to assume, arguendo, that petitioners actually paid Vortex the amount of the reimbursement in 1976, petitioners would still not be entitled to a deduction based solely on their belief that they might have been personally liable for the underlying legal expenses. In order to claim *420 a deduction under section 162(a), petitioners must prove that those expenses were directly connected with or pertained to their trade or business. Sec. 1.162-1(a), Income Tax Regs. Petitioners may have identified their business of working as salaried officers of Vortex, Weddle v. Commissioner, 39 T.C. 493, 497 (1962), affd. 325 F.2d 849 (2d Cir. 1963), with the business of Vortex, but the two are legally distinct. Noland v. Commissioner, 269 F.2d 108, 111 (4th Cir. 1959), affg. a Memorandum Opinion of this Court, cert. denied 361 U.S. 885 (1959). It is well established that the business of a corporation is not that of its shareholders, officers, or employees. See, e.g., Whipple v. Commissioner, 373 U.S. 193, 202 (1963); Deputy v. du Pont, 308 U.S. 488, 494 (1940); Noland v. Commissioner, supra; Estate of Byers v. Commissioner, 57 T.C. 568, 577 (1972), affd. 472 F.2d 590 (6th Cir. 1973). Thus, we find that the legal expenses underlying the reimbursement in question proximately resulted from the business in which Vortex was engaged, rather than from petitioners' business of working as corporate officers. Although petitioners were named as defendants in one of the three suits which *421 comprise the Lenora Johnson Litigation and added in another, neither petitioner was a party in the Zverina Litigation. Furthermore, the plaintiffs made various allegations against all of the defendants in the settled suits. It therefore cannot be assumed that petitioners were obligated to pay the legal expenses incurred in connection with settlement of those suits or to reimburse Vortex for doing so. Schrott testified that concern over the possibility of a derivative action by the minority shareholders of Vortex also prompted him and petitioners to reimburse Vortex. That concern stemmed from their belief that as officers of Vortex, Schrott and petitioners had caused Vortex to lose a substantial sum investing in wine contracts and exposed it to suits initiated by disgruntled wine contract investors. The theory that petitioners reimbursed Vortex because of the possibility of a derivative action was mentioned on brief without accompanying argument or citation to legal authority indicating the extent, if any, of petitioners' exposure to liability. [34] Accordingly, we deem petitioners to have abandoned such theory even though certain minority shareholders commenced a derivative action *422 in 1981 against Vortex and its officers and directors for wrongful use of corporate assets and breach of fiduciary duty. [35] *423 Petitioners alternative argument presents the question of whether one taxpayer can deduct the expenses of another taxpayer. Generally payments of another taxpayer's expenses are not deductible as ordinary and necessary business expenses. Lohrkev. Commissioner, 48 T.C. 679, 684 (1967). An exception exists to this general rule, however, if the taxpayer pays the expenses to protect or promote his own trade or business even though the transaction giving *424 rise to such payment originated with another taxpayer and would have been deductible if made by that taxpayer. Gould v. Commissioner, 64 T.C. 132, 134-135 (1975); Lohrke v. Commissioner, supra at 684-685; Pepper v. Commissioner, 36 T.C. 886, 895 (1961). In this case, petitioners were carrying on the trade or business of being officers of Vortex. Primuth v. Commissioner, 54 T.C. 374, 377 (1970). In Lohrke v. Commissioner, supra at 688, we stated that: The tests as established by all of these cases are that we must first ascertain the purpose or motive which cause the taxpayer to pay the obligations of the other person. Once we have identified that motive, we must then judge whether it is an ordinary and necessary expense of the individual's trade or business; that is, is it an appropriate expenditure for the furtherance or promotion of that trade or business? If so, the expense is deductible by the individual paying it. Thus, in determining the deductibility of payments by one taxpayer of another taxpayer's expenses, we must (1) ascertain the purpose or motive of the taxpayer paying such expenses; and (2) decide whether sufficient nexus exists between those expenses and that taxpayer's *425 own trade or business. Lohrke v. Commissioner, supra.Petitioners bear the burden of proving that they are entitled to a deduction under this two-pronged test. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Although petitioners stated several reasons for making the reimbursement in question, we do not believe that the dominant motive was to protect or promote their trade or business of working as officers of Vortex. It does not appear from the record that petitioners' maximum salary was dependent upon their reimbursing Vortex for the legal expenses it paid in the prior year. Estate of Byers v. Commissioner, supra at 577. Moreover, petitioners failed to prove that the reimbursement was made to protect their jobs or was otherwise proximately related to carrying on their trade or business as officers of Vortex. Cf. Gould v. Commissioner, supra at 136. Protection of their salaries and jobs did not depend upon reimbursement because petitioners, together with several members of their immediate family, controlled Vortex. Petitioners also argue that their interest in protecting their business reputations motivated the reimbursement of Vortex. Petitioners rely on the numerous *426 cases holding generally that payments made with the primary motive of protecting the taxpayer's personal business reputation in his ongoing business are deductible. See, e.g., Pepper v. Commissioner, 36 T.C. 886 (1961); Jenkins v. Commissioner, T.C. Memo. 1983-667. Petitioners have not however demonstrated how their failure to reimburse Vortex, a corporation owned almost entirely by them and other members of their immediate family, would have had an adverse impact on their business reputations. Thus, petitioners have failed to prove that their primary motive for reimbursing Vortex was to protect or promote, either directly or through their reputation, any trade or business in which they were engaged. The second prong of the test we set forth in Lohrke v. Commissioner, supra, requires a determination of whether the payment was an ordinary and necessary expense of the taxpayer's own trade or business. Because both prongs of the test must be met for the exception to apply, we need not reach the second prong but the facts discussed above indicate that petitioners also failed to satisfy that prong. The Supreme Court made the following statement regarding an expense such as the one in *427 question here: Men do at times pay the debts of others without legal obligation or the lighter obligation imposed by the usages of trade or by neighborly amenities, but they do not do so ordinarily, not even though the result might be to heighten their reputation for generosity and opulence. Welch v. Helvering,290 U.S. 111, 114 (1933). We find that the reimbursement was not an ordinary and necessary expense of petitioners' business, apart from the business of Vortex. Rather, it seems to us that the reimbursement was merely an attempt to shift legitimate corporate expense deductions from Vortex, which had little or no income, to petitioners, who could presumably derive a greater tax benefit from those deductions. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Respondent determined petitioners' distributive share of income from the following six partnerships: Street Associates, Churchill Associates, Lynton Associates, Kenilworth Associates, Elm Associates, and Frome Associates. Petitioners have not responded to respondent's determination except as it pertains to Kenilworth Associates. Therefore, we consider any issues regarding the other five partnerships to have been conceded by petitioners.↩
2. Unless otherwise indicated, all future references to "petitioners" shall be to John D. Schrott and Winona W. Schrott, notwithstanding her death and the subsequent substitution of her estate as a petitioner.↩
3. Vortex incurred other costs in the amount of $ 44,087.41 in connection with the installation of the security systems but none of those costs were attributable to the system installed at petitioners' residence.↩
4. Although the record indicates that it had an adjusted basis in the abandoned home security systems of $ 47,443, Vortex claimed an adjusted basis in those systems of $ 47,571. Vortex's adjusted basis in the home security systems was largely attributable to costs incurred in connection with the installation of the system at Schrott's residence for work performed by parties other than ADT. See n. 3, supra↩.
5. Respondent also determined that petitioners received a cash distribution in the amount of $ 8,976 in 1974. However, neither that distribution nor its treatment by petitioners are at issue in this case.↩
6. In his notice of deficiency, respondent determined that the value of the home security system was $ 23,786 without any explanation of how he arrived at that figure. Respondent subsequently conceded on brief that the value of that system was not more than $ 18,443.04, the contract price which Vortex agreed to pay ADT to have it installed.↩
7. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
8. The term "industrial wine" typically refers to low grade wines unfit for consumption as a beverage but satisfactory for other uses such as cooking, salad dressings, etc. ↩
9. "Wine contracts" constituted the agreements between investors and Ridge Associates & Company(Ridge), a general partnership organized and owned by Johnson through which he operated his wine contract scam. As security for the performance of such agreements, Johnson acting on behalf of Ridge executed promissory notes in favor of the investors promising to repay the amounts invested on the same date as the payment of the wine contract proceeds. Unless otherwise indicated, all further references to "wine contracts" refer to the agreements regarding the payment of wine contract proceeds as well as the promissory notes executed in conjunction therewith.
10. Petitioners, Vortex, and Schrott also dealt with the McLean Bank and the Northern Virginia Bank but their dealings with those banks are only incidental to the issues involved herein.↩
11. Petitioners' daughter and son-in-law, Carole Crouse and David B. Crouse, also invested in wine contracts.↩
12. Although we cannot identify the exact source of the funds invested and lost, the amount not borrowed from UVB was presumably borrowed from other banks or came from petitioners' funds. See n. 10, supra↩.
13. Although Parkwood never issued a modified promissory note, Vortex and petitioners acted as if such a note actually had been issued and assigned, or soon would be issued and assigned. ↩
14. Vortex arrived at a discounted value of $ 275,000 by applying to the face value of $ 400,000 a discount rate based upon the then current New York prime rate of 10-1/4 percent plus a 1 percent premium for 5 years. The difference which petitioners agreed to refund to Vortex amounted to $ 41,680.01 ($ 275,000 - $ 233,319.99). The amount of the promissory note underlying the refund agreement was subsequently reduced to $ 21,000 and eventually cancelled altogether.
15. At that time, Parkwood owed $ 400,000 on the Parkwood Note and an additional $ 140,000 on the Vortex Note it assumed at purchase.↩
16. In the absence of evidence to the contrary, we conclude that petitioners assumed the obligation to make payments on the Vortex Note when the stock and assets of Columbia were assigned to them after repudiation of the Parkwood Note.↩
17. On brief, petitioners initially suggested that the total amount of their cancelled Investor Notes and Fee Notes was $ 733,000 and $ 135,840, respectively. However, petitioners neither argued for nor put forth evidence in support of those amounts. ↩
18. Although petitioners reported $ 33,000 as income from the discharge of indebtedness on their 1975 Federal income tax return, they claim to have done so erroneously.
19. Insolvent debtors discharged after December 31, 1980, can obtain similar results under section 108. That section authorizes a debtor to exclude income from the discharge of indebtedness to the extent of insolvency immediately before the discharge.
20. Implicit in petitioners' argument is the contention that they were insolvent by $ 207,403 before the discharge of indebtedness because the discharge increased their net worth by $ 168,840, the amount of the discharged debt.↩
21. Parkwood was the nominal obligor for Johnson who was forced into bankruptcy after exposure of his wine contract scam.↩
22. Petitioners rely upon the following statement made by the recognized commentator Professor James S. Eustice: "Section 108(e) (2) preserves a tax benefit exclusionary theme from prior law by exempting from the debt discharge rules of section 108 the cancellation of undeducted expense type' liabilities." Eustice, "Cancellation of Indebtedness Redux: The Bankruptcy Tax Act of 1980 Proposals -- Corporate Aspects," 36 Tax L. Rev. 1, 19↩ (1980). As further support for their position, petitioners cited the following statement made by a member of the Staff of the Joint Committee on Taxation: "[Section 108(e) (2)] prevents discrimination against a cash basis taxpayer by clarifying that the forgiveness of a debt, payment of which would have given rise to a deduction, will not cause the debtor to realize income." Hirsch, Memorandum: "The Bankruptcy Tax Act of 1980," 81 Tax Management Memorandum (BNA) No. 7, p. 5 (April 6, 1981). 23. Warren & Sugarman, "Cancellation of Indebtedness and Its Tax Consequences": I, 40 Colum. L. Rev. 1326, 1345 (1940); Eustice, "Cancellation of Indebtedness and the Federal Income Tax: A Problem of Creeping Confusion," 14 Tax L. Rev. 225, 252↩ (1959). 24. There is no rationale under the income from discharge of indebtedness rule for treating taxpayers differently depending on their method of accounting. As we noted in Putoma Corp. v. Commissioner, 66 T.C. 652, 668 n. 20 (1976), affd. 601 F.2d 734 (5th Cir. 1979), "When two taxpayers have the same accretion to wealth from cancellation of indebtedness, why should the full accretion be taxed to the cash basis taxpayer while the accrual basis taxpayer is taxed only to the extent of a prior tax benefit." Congress eliminated this irrational distinction by enacting section 108(e)(2).
25. There is no increase in net worth under the freeing of assets theory unless the debtor received valuable consideration upon incurrence of the debt subsequently discharged. Such consideration is not however limited to money or property. Putoma Corp. v. Commissioner, 66 T.C. 652, 664-665 (1976), affd. 601 F.2d 734↩ (5th Cir. 1979). Although it was not made to appear in the record what value petitioners received, we note that the Fee Notes were issued as "payment to Vortex for services rendered in participating in wine contract investments." Although Johnson defaulted on some of the underlying wine contracts, petitioners neither argued nor proved that the services rendered to them were without value.
26. We need not decide whether payment of the discharged Fee Notes would have given rise to a deduction because we disagree with the basic premise of petitioners' argument regarding exclusion.↩
27. On brief, petitioners alternatively assert that they are entitled to offset the income from discharge of Investor Notes by claiming a loss under section 165↩. We treat petitioners' alternative assertions together because we do not understand them to be separate arguments. We note that, in any event, separate treatment of petitioners' alternative assertions would not change our result.
28. We note that appeal in the instant case, if taken, will lie in the Fourth Circuit. Therefore, we are not bound by the Fifth Circuit's opinion in Stackhouse v. United States, 441 F.2d 465 (5th Cir. 1971). Golsen v. Commissioner, 54 T.C. 742, 756-757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Further, the decision in Stackhouse has been nullified by the enactment of the Bankruptcy Tax Act of 1980. S. Rept. 96-1035, at 21 (1980), 1980-2 C.B. 631. Gershkowitz v. Commissioner, 88 T.C. 984, 1008↩ (1987).
29. Petitioners offered no explanation why they considered section 752(b)↩ not to be applicable, and we know of no reason why that section would not operate as described in the text under the facts of this case.
30. The total of the costs described in the letter, the remainder of the Lenora Johnson Litigation settlement cost in the amount of $ 146,842 ($ 263,842 - $ 117,000), the entire cost of the Zverina Litigation settlement in the amount of $ 68,390.92, and attorneys' fees in the amount of $ 3,000, exceeded the amount petitioners offered as reimbursement by $ 18,000.
31. Petitioners' son-in-law, David B. Crouse, and J. Dent Farr, Jr., served on Vortex's board of directors with petitioners and Schrott.↩
32. Respondent allowed petitioners to deduct the reimbursement in the amount of $ 117,000 made to Vortex in 1975. Although the propriety of that deduction is not at issue here, we note that acceptance of a prior year's return does not create estoppel as to later years. Meneguzzo v. Commissioner, 43 T.C. 824, 836↩ (1965).
33. Of course, we express no view as to whether petitioners might otherwise prevail in any future action seeking relief under the mitigation provisions.↩
34. We realize that the existence of a legal obligation to make an expenditure is not required to qualify an expense as necessary. Waring Products Corp. v. Commissioner, 27 T.C. 921, 929↩ (1957). However, we cannot determine the necessity of the reimbursement based upon a passing reference to the possibility of a derivative action. 35. The derivative action involved numerous allegations of wrongdoing on the part of defendants dating back to 1973. In an unpublished opinion issued in 1982, the United States District Court for the Eastern District of Virginia found that the defendants were liable for damages due to their gross mismanagement and the corporate waste arising from their improper transactions and self dealing. That court further found that the conduct of the defendants, taken as a whole, rose to such a level as to justify an award of punitive damages. The damage issues were never tried because, subsequent to the court's ruling on liability, the Schrott family bought out the minority shareholders' interest in Vortex which amounted to approximately 15 percent.